## THE COLORADO.

### THE STEAM LIGHTER NO. 24.

(District Court, S. D. New York. November 1, 1909.)

COLLISION (§ 39*)—EVIDENCE.

Collision off Governor's Island between an ocean going steamer bound to sea and a steam lighter proceeding up the channel to Weehawken. *Held*, that the collision was entirely owing to faults of the lighter: (1) In changing to the starboard after having obtained a safe place for naviga-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

tion on the westerly side of the steamer, and (2) in failing to blow a navigating signal at the proper time.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 39; Dec. Dig. § 39.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

(Syllabus by the Judge.)

In Admiralty. Action by the New York Central & Hudson River Railroad Company against the steamship Colorado, and cross-action by the Mallory Steamship Company against the New York Central Steam Lighter No. 24. The libel against the Colorado dismissed, and decree rendered against the steam lighter.

Wallace, Butler & Brown, for the No. 24.

Wheeler, Cortis & Haight, for the Colorado.

ADAMS, District Judge. These cross libels grew out of a collision which took place in the evening of January 31, 1908, between the New York Central steam lighter No. 24 and the steamship Colorado. The former was bound from Bush's Docks, South Brooklyn, loaded with general merchandise, for Weehawken, New Jersey. The latter was bound from pier 15, East River, to sea, on a regular voyage to Mobile, Alabama. The vessels came together at some point between Governor's Island and Bedloe's Island, the Colorado striking the No. 24 on her port side, about abreast of the forward part of the pilot house, and causing such damage that the latter sank very quickly. The Colorado went to anchorage almost immediately. The damages are alleged to have been about $35,000 to the No. 24 and about $12,000 to the Colorado.

The libel of the No. 24 alleges that her regulation lights were properly set and burning brightly and that when she was off the southwesterly extremity of the wall south of Governor's Island and heading on a course toward the North River, the red side light and masthead light of the Colorado were seen about 3 points off the starboard bow of the lighter; that the steamship was then off Castle William and heading for about Liberty Island; that the No. 24 then gave one blast of her whistle to indicate that she was directing her course to starboard for the purpose of passing under the stern of the steamer in order to permit the steamer to maintain her course and speed as the privileged vessel; that to accomplish this manœuvre the wheel of the lighter was promptly ported and under its influence her heading was so changed that her port side was exposed to the port side of the steamer and if the course of the latter had been maintained the vessels would have passed in safety port to port; that the steamer made no reply to this signal; that after the course of the No. 24 had been changed so that the vessels were proceeding port to port, the master of the No. 24 observed that the steamer was not maintaining her course but was changing it and swinging rapidly toward the lighter; that thereupon in order to prevent, if possible, the threatened collision the master of the No. 24 gave bells to the engine room for extra full speed ahead, which order was promptly obeyed, gave danger blasts and ported the

wheel further, changing the course of No. 24 so that she headed toward the Governor's Island wall; that notwithstanding the signals given by the No· 24, the Colorado kept on at full speed, opened her green light and swinging rapidly toward the No. 24 struck her a crushing blow about amidships on the port side, cutting deep into the vessel, causing her to sink shortly afterwards; that the collision occurred about 5 :50 p. m., to the eastward of the center of the channel between Governor's Island and Bedloe's Island, which channel is a narrow channel; that the tide was flood, the night clear and there was a fresh breeze from the north.

The libel then proceeds as follows:

"Third: Said collision and the damages resulting therefrom occurred without fault or neglect on the part of said New York Central steam lighter No. 24 or of those in charge of her navigation, and were wholly due to and caused by the faults and negligence of the steamer Colorado and of those in charge of her navigation in the following among other particulars, in that

(1) Said steamer although she had said steam lighter on her own port side, did not hold her course and speed, but on the contrary changed her course to port and in the direction of said steam lighter. (2) Said steamer, having the said steam lighter on her own port bow, did not give a single blast of her whistle as a signal of her intention to cross the course of said steam lighter, nor any signal to inform said steam lighter of her change of course. (3) Said steamer failed to maintain her course and speed, but on the contrary changed her course without giving any signal of her intention so to do to the No. 24 and obtaining the consent of the lighter thereto. (4) Said steamer did not slow, stop or reverse her engines in sufficient season to avoid collision but on the contrary maintained full speed until the collision. (5) Those in charge of said steamer maintained no proper or sufficient lookout. (6) Said steamer having by her improper change of course become the burdened vessel, did not keep out of the way of the No. 24. (7) Said steamer did not proceed through the narrow channel between Governor's Island and Bedloe's Island in the starboard or westerly half thereof, although it was safe and practicable for her so to do, but on the contrary attempted to proceed through the port or easterly half of said narrow channel, contrary to the provisions of the Inland Rules and to the dictates of good seamanship. (8) Said steamer was in charge of incompetent persons, and in such other and further particulars as the libelant may be able to point out on the trial."

The libel of the Colorado alleges that she left pier 15, East River, on her voyage, with the captain and quartermaster on the bridge, and the first officer and a competent lookout stationed forward; that the tide was flood, the night dark, lights being plainly visible; that the Colorado proceeded slowly down the East River and ported her wheel to pass south of the Battery; that while rounding the Battery, the Colorado passed several vessels on her port hand and in doing so worked pretty well over toward the anchorage buoys; that the vessel was then starboarded to straighten the course down toward the Narrows and the Colorado was swinging to port slowly when a white light, which afterwards proved to be on the No. 24, was sighted about 2 points on the port bow; that no side lights were visible, and from this fact, and the movement of the white light, the master of the Colorado judged that the lighter was headed away from him and toward the western side of the harbor; that shortly afterwards the white light then showing almost directly ahead, the Colorado blew a signal of 2 whistles but received no answer; that as the vessels approached, the master of the Colorado was able to distinguish the hull of the lighter

through his glasses and then saw that she was bound up toward the North River and on a course about parallel to that of the Colorado, but to the westward of her; that the lighter was still showing nothing but the single white light, but when she had approached still closer the master of the Colorado caught the glimmer of a green light, which looked as if the light was shining upon some obstruction; that as the lighter was on the Colorado's starboard hand and as the Colorado was still swinging to port, the situation appeared to be one of perfect safety; that when, however, the lighter was about 150 or 200 yards from the Colorado, the lighter suddenly blew a signal of one whistle and changed her course, shutting out the glimmer of the green light and swinging directly across the Colorado's bow; that alarm whistles were blown by both vessels but the lighter was so close to the Colorado at the time of her change of course that the master of the Colorado considered it impossible to avoid sinking the lighter by reversing his engines and kept her swinging to port to strike, if possible, a glancing blow; that the two vessels came together, however, in a serious collision, resulting in considerable damage to the bow of the Colorado, and injuring the lighter so seriously that she shortly afterwards sank.

It is then alleged:

"Third. Said collision was not due to any fault or lack of precaution on the part of the steamship Colorado, or those in charge of her navigation, but was wholly due to the fault and negligence of the steam lighter No. 24 and those in charge of her navigation in the following, among other, particulars, which will be pointed out at the trial:

I. In that her lights were not properly set, or were obscured. II. In that she did not maintain a proper or sufficient lookout. III. In that she did not recognize that the Colorado was bound to sea, and navigate accordingly. IV. In that she was proceeding on the westerly side of the channel between Governor's Island and Bedloe's Island. V. In that she did not answer the two whistles from the Colorado and act in accordance therewith. VI. In that she did not hold her course, but attempted to cross the bow of the steamship. VII. In that she increased her speed before the collision instead of stopping and backing."

This collision occurred about 6 o'clock. The Colorado was working under her harbor bells and was making probably 6 or 7 knots. It is claimed by the Colorado that the white light of the lighter was seen and subsequently the glimmer of a green. The lighter was making about 10 knots. It is claimed for her that the lights were fully visible and should have been seen by the Colorado. There is a great conflict of testimony concerning this matter, as indeed there was about all the important points in the case.

It is not claimed that the lighter did not have her lights burning but that they were obstructed and did not show. Four witnesses from the Colorado stated that the side lights did not show to them. The master on the bridge, said that he watched her carefully with a pair of powerful marine glasses and he was positive when he saw and blew to her that no colored light was showing. Subsequently, however, he admitted seeing the glimmer of a green light. He said:

"It was not the brilliancy of a light at all; it was the same as a light shining out on something; the body of the light itself hidden and the rays shining out across something; that was the effect it had, looking at it through a pair of glasses."

The quartermaster said that the first he knew of the presence of the lighter was after the captain blew two whistles, when he stepped to one side and saw the form of the lighter a little open on his starboard bow, about a point, 700 or 800 yards away, but not close enough to suggest trouble; that he could see the blur of her outline but could not recollect seeing any light; that he looked a second time when she must have been 250 to 300 yards away, she was then crossing the Colorado's bow and he could not see any colored lights. The chief officer said that he first saw the lighter after they were past Castle William and he then saw a small bright white light a point on the starboard bow, a half a mile away, which he reported to the captain, but saw no colored light. He did not continue watching as he had other work to do and paid no more attention to it; that he did not anticipate any danger of collision, and the next time he saw the lighter it was just about the happening of the collision. The lookout, standing forward on the bow, saw the bright light a point and a half to two points on the starboard bow but no colored lights, he thought it was 300 or 400 yards off at the time and there was no danger of collision; that he saw it several times before the collision but did not watch it carefully, "for I looked on both sides and right ahead too"; that he first saw any colored lights "when she struck, after the collision."

It appears that the lighter was about 100 feet long and generally engaged in picking up freight around the various steamboat and railroad piers in the harbor of New York for delivery to the railroad at Weehawken or West 65th Street. She contends that on this occasion her lights were not obscured.

The testimony from the lighter consists of that given by the master and of one of her deck hands, the other deck hand having been drowned by the collision.

Her master said that she was exhibiting the regulation head light, side lights and pole light, and that none of them was obscured; that the side lights were held in the lower of two sets of brackets on the sides of the pilot house, which the witness said he estimated to be at about 10 feet above the deck, but the counsel for the lighter said 7 feet 11 inches. The witness also testified to the placing of the other lights, i. e., the staff light and the head light. He said a part of the cargo was stowed on the deck forward of the pilot house and it is the contention of the Colorado that this cargo was the obscuring cause. He further said that on this occasion they were going to Weehawken with the flood tide and, as they were going home, they were doing the best they could, 9 or 10 miles an hour, possibly a little better than ordinary full speed; that the mate Corry was in the wheel house with him as lookout; that as they proceeded north they saw the masthead light and the port light of the Colorado, 3 or 4 points on his starboard bow and at that time he was showing to her the head light, starboard light and pole light; that just about this time he sent the mate out to look at the canvas covering of the cargo and the mate remained forward; that the side lights were lost in the collision.

Corry, the surviving deck hand, said it was his duty to attend to the head light; that he cleaned and filled it the day of the collision and

placed it above the niggerhead on the stem; that there was nothing to prevent it from being seen forward; that there was no cargo forward of the forward hatch but aft of that and forward of the house a number of bags of rice were stowed coming to within about 3 inches below the deck of the house; that he saw the lighted red and green lights placed on the pilot house before they left Bush's Docks by the missing deck hand; that he went below and hearing the captain blow one whistle and danger blast he came up on deck; that the cargo was not in such a position as to hide the red and green lights from a vessel ahead; that the top of the bags were 3 inches below the top of the coaming of the upper deck, the forward part of the cargo being somewhat lower than the after part.

The master of the Lehigh Valley Lighter Towanda, bound to Black Tom, from pier 11, Brooklyn, between the Battery and Governor's Island, when he rounded Castle William, saw the green light of No. 24, then rounding the lower end of Governor's Island.

It appears by other testimony for the lighter that her lights were seen at about the time of the collision but apart from such testimony, the thing to be ascertained is, what lights should have been seen by an approaching vessel. It is shown that the green lights of the lighter were actually seen by those on the Towanda, as stated above, and it also appears that when the lighter was 700 or 800 yards away from the Colorado, the master of the latter saw what he called the "glimmer" of the green light in a position that would have caused the vessels to pass within 20 or 25 yards of each other.

There is no dispute that the lighter had a deck load, stowed forward of the pilot house, which came near to obscuring the lights, but it is contended that it did not actually do so. I think it is probable that the lights were visible to careful observers over her deck load, and the important question in the case is whether the navigation of the vessels was in conformity with the rules and ordinary prudence.

The story told by the lighter is that she left Bush's Docks, Brooklyn, South of Governor's Island, at 5:30 or 5:35 p. m. bound for Weehawken, and cut directly across the flats toward Governor's Island and approaching there, she turned under a slight port helm in order to head almost directly for the center of the North River; that coming around the southerly end of the filled in portion of the island and about 500 feet therefrom, she sighted the port light and the range lights of the Colorado coming out above Castle William and angling toward Ellis Island; that the vessels were then ½ to ¾ of a mile apart, the Colorado bearing about 3 or 4 points on the starboard bow of the No. 24; that the master realizing that the vessels were on crossing courses and that it was his duty to avoid crossing ahead of the steamer, he ordered a single blast of her whistle and ported her helm a few spokes; that no answer was made to his signal, which did not alarm him as he expected the Colorado would steady to obtain her southerly heading down the channel, but as the vessels drew nearer, to his consternation, the Colorado when 200 or 300 feet away and the vessels still port to port, suddenly increased her swing, opened her green light and shut out her red; that the master of the lighter being required to come to an

immediate decision, determined to increase his speed and rang bells to accomplish it and hard-a-ported his helm; that the Colorado neither changed her speed nor her swing toward Governor's Island but continued on, with the result that her stem struck the port side of the No. 24, abreast of her pilot house, at nearly right angles; that at the time of the collision the No. 24 was heading about for the red light on Castle William and the Colorado was angling in toward the filled in ground or basin of Governor's Island; that in order to gain time to save the crew, the master of the Colorado kept working ahead on his engines with the result that he executed a complete turning manœuvre so that when the No. 24 sank, the Colorado was heading up the North River with the lighter impaled on her bow; that the circling manœuvre of the vessel assisted by the flood tide and a "set off" from Governor's Island at that point, with the result that the final resting place of the No. 24 was considerably above and to the westward of the point of collision.

The account given by the Colorado is, that when she rounded the Battery she was forced to the westward of the channel by some other vessels and she then starboarded and started to swing to the southward to head for the Narrows; that after she swung sufficiently so that the Statue of Liberty was on her starboard bow, the white light of No. 24 was made out, then bearing about 2 points on the Colorado's port bow and about a mile away; that at the time of sighting the No. 24 the master of the Colorado could see that the No. 24 was not exactly stern on but appeared to be moving toward the New Jersey shore; that no side lights whatever were visible and the master concluded it was some vessel bound across toward the New Jersey shore; that on the proper assumption that the vessel was not approaching him, he blew her a signal of 2 whistles; that he had watched the No. 24 before blowing his signal until she was almost exactly ahead; that the Colorado was still on a swing to port and the No. 24 moving somewhat toward the Jersey shore as already stated; that the lighter did not answer the signal of two whistles from the Colorado, which did not surprise the master particularly as he did not consider, in view of the divergent courses of the two vessels, that it was necessary to blow No. 24 at all; that under the starboard wheel of the Colorado and the course of the No. 24, the relative positions of the two vessels changed until the No. 24 was on the Colorado's starboard bow and the master of the Colorado then for the first time caught the glimmer of a green light from the No. 24 and realized that the No. 24 instead of being bound away from him, was actually headed up toward the North River; that at the same time he did not feel that there was the slightest reason to anticipate trouble since the green light was far enough on his starboard bow to make his course perfectly safe, the two vessels being green to green and manifestly on courses which would carry them clear; that suddenly, when the No. 24 was only about 600 or 700 feet ahead of the Colorado, she changed her course sharply toward Governor's Island and blew a signal of one whistle; that this change of course was made after the glimmer of the green light was first seen and the green light was thereby shut out; that the vessels were then near enough so that the hull of the No. 24 could be seen directly across

the Colorado's bow; that the vessels were so close together that it was impossible for the Colorado to avoid collision by changing her course under a port wheel and there was not sufficient space in which to check the swing to port, which the Colorado still had, and change her course to starboard; that the master did not dare to stop and reverse because the Colorado having a right handed propeller such a manœuvre would have checked her swing to port, and he thereupon did, what was in his judgment the safest thing, that is, put his wheel hard-a-starboard so as to increase the swing as much as possible in order that the vessels might come together on a glancing blow; that danger signals were at this time blown by both vessels; that the vessels came together at practically right angles; that at the moment of collision the Colorado had swung so that she was heading for the wall at the lower end of the island; that the wheel of the Colorado was kept hard-a-starboard after the vessels came together in the endeavor to keep the lighter afloat until all the men should be saved, and, if possible, to push the No. 24 into shallow water near the island; that the cries of the men who were in the water could be heard from the Colorado and a boat was immediately lowered and a man picked up; that there was some delay in doing this and during the time the Colorado's engines were kept slow ahead and the No. 24 was worked in toward the island, probably 300 or 400 feet; that owing to the resistance of the No. 24 across the bow of the Colorado and the forward movement of the lighter's engine, the head of the Colorado was swung more and more to port until she was heading, at the end, practically toward the Battery and the bow of the lighter toward the Jersey shore; that the No. 24 suddenly went below the surface, and the Colorado finally proceeded to the southward of the Statue of Liberty and anchored.

We have here a dangerous collision brought about, it is contended, by the swing of each vessel from a safe passing position, that is, the Colorado suddenly swung from a position in which she was showing her red light to one in which she showed her green, and the No. 24 from a position in which she was showing her green light to one in which her red was, or should have been, seen.

The fact that whatever movement of the lighter there was after the collision was generally toward Governor's Island, until the Colorado was headed up the stream, would indicate that the point of collision was to the westward of the place contended for by the No. 24 and tends strongly to support the Colorado's contention. It is urged in this connection, that in making the necessary change of course on the part of the No. 24 in order to bring her ahead of the Colorado, after she had crossed her bow to the westward, if the Colorado's account of the matter is true, the No. 24 "committed the insane blunder of hard-a-porting, changing her heading from 6 to 8 points, and deliberately exposed her port side to the stem of an advancing steamer." While this is a very strong expression of the movement of the No. 24, I think it may be regarded as substantially correct.

The place where the No. 24 finally sank was described in the Weekly Notice to Mariners, Department of Commerce and Labor, Lighthouse Board, February 14, 1908, as follows:

"Steamlighter No. 24, wreck buoy, a H. S. first-class spar, was established February 6 in 82 feet of water, to mark the wreck of the New York Central & Hudson River Railroad Company's steamlighter No. 24 sunk off Governor's Island.

Governor's Island Light..................................E SE ½ E

Southwest part of Sea Wall south of Governor's Island......S ¾ W

Statue of Liberty.........................................W ¾ S

The buoy is 50 feet northeast of the wreck which lies in deep water, and only her mast could obstruct deep water vessels."

This was practically 1,800 feet from the wall of Governor's Island.

The testimony of Mr. Andrews, a civil engineer, who has been acting for the War Department for about 20 years in hydrographic work in New York Harbor, is illuminative of the movements of sinking vessels in the locality of the wreck. He said that the direction of the ebb tide, with allowance of a degree for possible deviation, is S. 28° W. and the flood tide, subject to the same allowance, is N. 29° E., and the sub-surface currents are practically in the opposite directions and the latter would not run to any extent across the surface currents. He further said that a sinking vessel would be carried with the flood tide, which prevailed at the time, N. 29° E. until it was a part of the way down and then the sub-surface current would carry it in the opposite direction, so that it would probably land on the bottom about under where it sank. He further said that a vessel resting on the bottom approximately in the vicinity of the buoy would not move with the currents and that there is no such disturbance of the surface of the water, as was described by one of the No. 24's witnesses, as existing in the form of a circle. Mr. Andrews' testimony seemed to be entirely credible and tends to show that if the lighter was struck as far to the westward as the place where she lay sunk, which is probable, No. 24's testimony that she was within about 600 feet of the wall can not be true.

Having ascertained that the place where the vessel finally sank, and the most credible testimony seems to sustain the view that there was not much change, if any, to the westward during the sinking, was nearer the center of the channel than the No. 24's testimony indicates, she must necessarily have proceeded farther to the westward than she admits and far enough to bring her to the westward of the Colorado and to a place where a sudden and considerable change to the eastward was requisite to bring the vessels together.

This view of the situation reconciles the result with the Colorado's testimony that she saw the (glimmer of the) green light on her starboard bow shortly before the collision and renders unnecessary any definite conclusion as to the obscuration of the No. 24's lights by her cargo. If, as I have above stated, the lights of the No. 24 were exhibited, still the Colorado might not have seen them because the No. 24 was, when in view, proceeding on a heading somewhat across the Colorado's bow to the westward and the red light would naturally have been shut out.

There is another feature of the case which also seems to establish fault on the No. 24's part, that is, her signals or the absence of them.

The master testified that he blew a signal of one whistle when he was still to the southward of the lower end of Governor's Island and that

173 F.—42

he blew no other whistle until he sounded an alarm just before the collision. He received no answer to the signal of one and he says that he saw the Colorado was constantly swinging toward his course in violation of the whistle which he had blown. In this situation he was bound to repeat his signal and if it was still disregarded, to stop and reverse. Instead of doing this, he admits that he kept going ahead at full speed, blowing no other signal until the collision was unavoidable. The whistle he says he blew was when he was 500 feet south of the southern end of the Governor's Island wall and when the Colorado was passing Castle William. This was when the vessels were more than a mile apart, although he said three-quarters. It was blown to a vessel whose course was unknown to him. The rules say that whistles are to be blown when vessels "are within half a mile of each other" and are evidently meant to apply to vessels needing signals from each other. No whistles were heard by the Colorado until the last minute when the collision was inevitable.

The foregoing sufficiently shows that this collision can be accounted for by the No. 24's faults alone.

The libel against the Colorado is dismissed, and she will have a decree against the No. 24, with an order of reference.

3. BANKRUPTCY (§ 347*)—RIGHTS IN PROPERTY AFFECTED BY LIEN—ESTOPPEL OF LIENHOLDER.
A bank held the bonds of a bankrupt corporation, secured by mortgage on its property. The receiver in bankruptcy procured an order authorizing him to continue the bankrupt's business, and on his subsequent appointment as trustee obtained a further order to continue the business, on petition in which he showed a small profit from the previous operation and stated his belief that the business would at least hold its own. He made no further report for nearly a year, although the business was conducted at a large loss. Both orders were made without notice to the bank. *Held,* that it was not estopped by the fact that its attorney was also attorney for the receiver and trustee in procuring the orders, nor because its officers

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes